Estate of David E. Thompson, Deceased, Helen F. Thompson, Ralph A. Cook and C. D. Mullen, Executors, and Helen F. Thompson v. Commissioner.
Estate of Thompson v. Commissioner
Docket No. 110649.
United States Tax Court
1944 Tax Ct. Memo LEXIS 237; 3 T.C.M. (CCH) 492; T.C.M. (RIA) 44175; May 23, 1944
*237 Calvin E. Woodside, Esq., 1140 N. Gower St., Los Angeles, Calif., for the petitioners. Ralph E. Smith, Esq., for the respondent. ARNOLD
Memorandum Findings of Fact and Opinion ARNOLD, Judge: This proceeding involves a deficiency in income tax for 1938 in the amount of $480.41. The issue are (1) whether petitioners are entitled to a bad debt deduction of $73,950 under an agreement dated March 14, 1932, with the Municipal Bond Company, and (2) whether respondent erred in disallowing alleged expense items aggregating $1,473.66. Findings of Fact The petitioners are Helen F. Thompson and the above named executors of the estate of David E. Thompson, deceased. For 1938 David E. Thompson and Helen F. Thompson, husband and wife, filed a joint income tax return with the collector of internal revenue at Los Angeles, California. During 1927, 1928 and 1929, the decedent purchased from the Municipal Bond Company of Los Angeles, California, hereinafter referred to as the company, certain road improvement district bonds having an aggregate par value of $91,000 issued by the county of San Diego. These bonds consisted of $70,000 par value of bonds of Road District Improvement Number Fifty-two and *238 $21,000 par value of bonds of Road District Improvement Number Twenty-five. The decedent purchased $4,000 par value of the R.D.I. #25 bonds for the account of his sister and the remaining $17,000 par value for his own account. During 1931 the decedent, for himself and his sister, asserted certain claims and demands against the company based upon alleged misrepresentations of facts claimed to have been made by the company to induce him to purchase the bonds. On or about March 14, 1932, the decedent, as first party, and the company, as second party, executed an agreement with respect to the bonds purchased by decedent, the pertinent portions of which read as follows: "First party has asserted certain claims and demands against second party in connection with the purchase by first party of said R.D.I. [Road District Improvement] bonds and with respect to certain alleged representations pertinent thereto. Said claims and demands have been denied and disregarded by second party. "With a view to finally settling, compromising, and adjusting all claims, demands and differences whatsoever that have arisen in connection with said transactions, and as full accord and satisfaction thereof. *239 "It is Mutually Agreed by and between the parties hereto as follows: "First: Second party agrees to purchase from first party, and first party agrees to sell to second party, all installment coupons for interest hereafter maturing on said R.D.I. bonds, when and as the same shall mature and become due and payable according to their respective terms, for and at a price equal to the par value of said maturing installment coupons for interest as evidenced by said respective coupons. Said purchase price shall be paid by second party in cash upon delivery by first party to second party of said installment coupons for interest at or after the maturity thereof. "Second: Second party agrees to purchase from first party, and first party agrees to sell to second party, all of the said R.D.I bonds, when and as the same shall mature and become due and payable according to their respective terms, for and at a price equal to the par value of said maturing R.D.I bonds. Said purchase price shall be paid by second party in cash upon delivery by first party to second party of said maturing R.D.I. [bonds] at or after the maturity thereof. * * * * *
"Fifth: The faithful discharge of the rights and *240 the obligations herein created shall act and operate as the full and complete release and relinquishment of any and all claims and demands which first party might or could have against second party arising out of or in connection with the purchase by first party from second party of said R.D.I bonds and/or any other bonds heretofore purchased from second party by first party either for himself or for the account of others, and/or arising out of or in connection with any and all past transactions or relationships whatsoever between the parties hereto. * * * "Sixth: It is agreed that nothing herein shall limit the right of the first party to alienate any of said bonds and/or coupons by sale, descent or otherwise, but in such event this agreement shall extend to and follow each of said bonds and/or coupons." On September 16, 1932, the parties modified the agreement of March 14, 1932, by the company's execution and decedent's acceptance of four promissory notes, each dated September 16, 1932, and representing installment interest coupons up to July 2, 1934. Each note was for $3,045, was due on or before October 1, 1934 and bore interest at 7 percent from July 2, 1932, January 2, 1933, *241 July 2, 1933 and January 2, 1934, respectively upon which dates interest accrued upon said bonds. The notes were given in lieu of the cash payments required under the agreement of March 14, 1932, the first of which was due July 2, 1932, and as to which the company defaulted. As a condition precedent to the acceptance of these notes decedent required and the company paid his sister $4,000, the face value of the R.D.I. bonds purchased for her account from the company and $178.88 interest due on the bonds. In June 1933 decedent employed William A. Monten, a Los Angeles attorney "* * * to press such claims or bring such an action or actions as may seem proper by reason of the claimed fraud * * *" in selling him the bonds and/or arising out of the agreement of March 14, 1932. On October 21, 1933, decedent commenced an action #364437, in the Superior Court of California in and for the County of Los Angeles against the company and others including various officers and directors. The complaint contained four causes of action, the first three of which were based on fraud, and the fourth on deceit in inducing decedent to enter into the agreement of March 14, 1932. Service of process was made *242 on the company on March 5, 1934. The company demurred to the complaint and the demurrer was sustained in part and overruled in part. On or about June 29, 1934, the company notified decedent that it accepted his abandonment of the contract of March 14, 1932, as evidenced by his act in filing suit in docket numbered 364437, that it rescinded each and every part of the contract and tendered and offered to return to the decedent everything of value received under the contract, namely, the four bonds and detached interest coupons, when decedent returned the cash paid on September 16, 1932, and the aforementioned four promissory notes of $3,045 each executed in favor of the decedent. Under date of July 18, 1934, decedent advised the company that his action was "predicated upon the original frauds occurring some years ago and as well upon frauds alleged to have been practiced upon me in connection with the contract which is mentioned in your letter." Thompson requested that the president of the company make it clear whether he officially admitted the frauds charged and whether he, individually, admitted the frauds charged to him and the other defendants in connection with the contract. *243 The letter further states: "My action submits to the Court the questions therein raised and in due time I expect to learn the decision of the Court with respect thereto. In the event that the Court should agree with me that the claimed frauds were committed, then I assume the Court will give judgment accordingly. If the Court should be of the opinion that no fraud was initially committed or that no fraud was committed in the second instance, then I suppose the result might follow that the contract of March 14, 1932, is an entirely valid contract. In the latter case I might desire to maintain the rights thereunder in accordance with the determination of the Court. "You will see from the above that it is necessary for me to be clearly informed as to just what you are writing about. Your further expression is invited." Under date of August 1, 1934, the company in answer to decedent's letter of July 18, 1934, advised him that the defendants were fully aware that his action was - "* * * predicated upon certain alleged frauds alleged to have been practised upon you in connection with that certain contract hereinabove referred to, and it is upon the fact that the said action is so predicated *244 that we have based our rescission of said contract. "In order that you may be under no misapprehension in this matter, we wish to notify you that neither this company nor any of the defendants named in the said action, above referred to, admit in any manner that any fraud or frauds, either as alleged and charged by you or otherwise, or at all, have been or ever were committed or practised upon you either in connection with any or either of the matters or things alleged in your complaint filed in said action or in connection with the contract of March 14, 1932 or otherwise or at all." The company repeated its tender and offer to return everything of value received from decedent conditioned upon his return of everything of value received from the company in connection with the contract of March 14, 1932. On August 9, 1935, Monten filed a first amended complaint in action #364437. The company again demurred and the demurrer was sustained in part and overruled in part. Thereafter and on October 3, 1935, Monten filed a second amended complaint. Demurrers thereto were again filed and were sustained in part and overruled in part. Decedent thereupon discharged Monten and employed new counsel, *245 Calvin E. Woodside, who dismissed the action in docket #364437 without further pleading and without answer to the original complaint, or as amended, ever having been filed. On March 12, 1936, decedent instituted an action numbered 399629 in Superior Court, against the company for the purpose of recovering the principal and interest of the four promissory notes executed by the company on September 16, 1936, and for damages of $12,180 for breach of contract, representing interest coupons maturing July 2, 1934 to January 2, 1936, inclusive, payment of which was refused by the company. The complaint alleged that the consideration for the execution of each note was the postponement by the decedent of the payment of certain amounts which the company was obligated to pay by the contract of March 14, 1932. In its answer the company admitted the execution of the notes which, it alleged, were executed and delivered solely in connection with and as a modification of the contract of March 14, 1932. The answer alleged that on or about March 5, 1934, decedent abandoned the contract of March 14, 1932, and that the company acquiesced in the abandonment and tendered decedent everything of value received *246 from him under the contract. This action was first decided in favor of the decedent. Upon rehearing it was decided in favor of the company. This decision was affirmed on appeal in Thompson v. Municipal Bond Co., 73 Pac. (2d) 274, and hearing was denied by the Supreme Court of California January 6, 1938. The final decision affirmed the trial court's finding that decedent abandoned the compromise agreement when he instituted and prosecuted his first suit against the company. In their joint income tax return for 1938 decedent and his wife, upon the advice of a deputy collector, reported a long term capital loss of $73,950 based upon a gross price for the bonds of $87,000 less $13,050, representing an estimated value of 15 cents on the dollar for the bonds. In computing their tax liability of $25.43 the taxpayers took into account 50 per cent of $73,950, or $36,975. The taxpayers rested their claimed capital loss upon the contract of March 14, 1932 and the subsequent court actions. The respondent denied the deduction and determined a deficiency of $5,552.22, which was paid. A claim for refund thereof with interest was filed by the taxpayers on November *247 18, 1940, upon the theory that taxpayers were entitled to deduct $73,950 as a bad debt since the contract of March 14, 1932 created a debt and the final decision of the court on January 6, 1938, cancelled the company's indebtedness to the decedent. The deficiency notice herein was mailed to the petitioners on March 10, 1942. It determined their correct income tax liability to be $6,058.06 and credited payments of $25.43 and $5,552.22 thereon. It disallowed investment expenses aggregating $1,473.66 and the long term capital loss of $36,975. It allowed additional deductions for contributions allowable in the amount of $1,860. The investment expense items disallowed were as follows: S. M. Salkeld, collection fees
$ 719.73
Ralph A. Cook, accounting and collect-
ing of defaulted and other bonds and
interest
200.00
Safe deposit boxes
32.50
Insurance and postage securities in
transit
81.43
James Schwellenbach, collection ex-
pense
300.00
Ralph A. Cook, keeping records
140.00
Total
$1,473.66
Petitioners made no claims in their original petition, or in the amendments thereto, that they had overpaid their tax. At December 31, 1938, the decedent had title and possession to *248 the R.D.I. bonds purchased from the company for his own account. The Board of Supervisors for the County of San Diego by a resolution dated September 24, 1935, fixed a schedule of prices to be paid by the county for bonds of its special assessment districts. The prices fixed for R.D.I. #25 and 52 bonds were 15 cents on the dollar for the face value of the bonds only. The agreement dated March 14, 1932, created no debt within the meaning of section 23 (k) of the Revenue Act of 1938. Opinion Petitioners contend that the first issue involves little, if any, factual controversy. They assert that the question presented is whether the contract of March 14, 1932, as amended, was a debt of the company within the meaning of section 23, Revenue Act of 1938, [1] and the applicable regulations. They urge us to "burrow under the words used in the contract and by extraneous evidence, if necessary, determine the real agreement between the parties." Tex-Penn Oil Co. v. Commissioner (CCA 3), 83 Fed. (2d) 518, 522, affirmed Helvering v. Tex-Penn Oil Co., 300 U.S. 481. See also Commissioner v. H. F. Neighbors Realty Co., (CCA 6) 81 Fed. (2d) 173. *249 Petitioners assert that the decedent never intended to abandon the contract of March 14, 1932, as amended, and that it was not until the final decision of the California Supreme Court in 1938 that he finally ascertained the worthlessness of his contract with the company. Petitioners excuse their claiming a capital loss on the contract in their joint return for 1938 upon the ground that they were so advised by a deputy collector of internal revenue after a full disclosure of the facts. The Tax Court is now asked to correct this error by approving their claim for refund, received as exhibit 15 in these proceedings. *250 We are unable to agree with petitioners' contentions. In the first place we have no jurisdiction over claims for refund. Secondly, the proper method of securing correction of the error, if error exists, would be to ask this Court to determine an overpayment of the tax as provided in section 809 of the Revenue Act of 1938. And finally, we are of the opinion that the contract of March 14, 1932, as amended, failed to create a debt. In Luke & Fleming, Inc., 1 B.T.A. 12, the Board said, page 14: To entitle a taxpayer to deduct from gross income, as a bad debt, an item ascertained to be worthless, and charged off in a given year, such a debt must have had existence in fact. A debt which never existed can not be charged off. The right to a deduction arises from the discovery that something which had value has ceased to have it; a debt which never existed had no value to lose. See also Hamlen v. Welch (CCA 1), 116 Fed. (2d) 413, 417; John F. Blanchard, 17 B.T.A. 1271, and cases cited therein. In Gilman v. Commissioner (CCA 8), 53 Fed. (2d) 47, affirming 18 B.T.A. 1277, *251 the Circuit Court defined the term "debt" as follows: A debt is "that which is due from one person to another, whether money, goods or services; that which one person is bound to pay to another, or perform for his benefit." Webster's New International Dictionary. "In order to create an indebtedness there must be an actual liability at the time, either to pay then, or at some future time." Bouv. Law. Dict., Vol. 2, page 1531. "Every debt must be solvendum in praesenti, or solvendum in futuro - must be certain and in all events payable; whenever it is uncertain whether anything will ever be demandable by virtue of the contract, it cannot be called a 'debt.' While the sum of money may be payable upon a contingency, yet in such case it becomes a debt only when the contingency has happened, the term 'debt' being opposed to 'liability' when used in the sense of an inchoate or contingent debt." 17 Corpus Juris, 1377. * * * [citing cases] * * * The term "indebtedness" as used in the Revenue Act implies an unconditional obligation to pay. Any definition more flexible would only encourage subterfuge and deception. The "notes" involved in this case did not constitute a debt of the *252 maker because their payment was contingent upon the payees being alive at the maturity of the instruments in 1950. The agreement of March 14, 1932 was at most an executory contract to sell as distinguished from a contract of sale of property. It transferred no property, it imposed no actual liability on the company at that time to pay the decedent any certain sum. If decedent continued to hold the coupons and/or bonds until maturity in accordance with their respective terms then the company became obligated to pay him cash therefor upon delivery. If, however, decedent alienated any bonds or coupons by sale, descent or otherwise, as he had the right to do under the agreement, the liability of the company thereon to him was extinguished, as the company's obligation followed the coupons and/or the bonds. Under these circumstances we can not agree with petitioners' major premise that a debt within the meaning of section 23 (k) was created. J. S. Cullinan, 19 B.T.A. 930. Cf. Lewellyn v. Electric Reduction Co., 275 U.S. 243; Wadsworth Mfg. Co. v. Commissioner (CCA 6), 44 Fed. (2d) 762; Philip H. Schaff, 46 B.T.A. 640; *253 Katherine J. Hanes, 2 T.C. 213; Pancoast Hotel Co., 2 T.C. 362. The petitioners presented no evidence with respect to the investment expenses involved in issue (2). The deficiency notice and the allegations of error itemize the amounts that make up the $1,473.66 deduction claimed in their 1938 return. But this showing does not prove their right to a deduction under section 23 (a) of the Revenue Act of 1938, as amended by section 121 of the Revenue Act of 1942. Decision will be entered for the respondent. Footnotes
1. The provisions of sec. 23 (k), Revenue Act of 1938, are as follows Sec. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions; * * * * *
(k) Bad Debts. - (1) General Rule. - Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverage only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. (2) Securities Becoming Worthless. - If any securities (as defined in paragraph (3) of this subsection) are ascertained to be worthless and charged off within the taxable year and are capital assets, the loss resulting therefrom shall, in the case of a taxpayer other than a bank, as defined in section 104, for the purposes of this title, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets. (3) Definition of Securities. - As used in this subsection the term "securities" means bonds, debentures, notes, of certificates, or other evidence of indebtedness, issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form.↩